## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**100 F Street, NE**<br>**Washington, DC 20549,** | : <br> : <br> : <br> : <br> : |
| **Plaintiff,** | : <br> : |
| **v.** | : <br> : |
| **FEDERAL NATIONAL MORTGAGE ASSOCIATION,**<br>**3900 Wisconsin Avenue, NW**<br>**Washington, DC 20016,** | : <br> : <br> : <br> : |
| **Defendant.** | : <br> : <br> : |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.     The Federal National Mortgage Association ("Fannie Mae," or the "Company") engaged in a financial fraud involving multiple violations of Generally Accepted Accounting Principles ("GAAP") in connection with the preparation of its annual and quarterly financial statements.   These violations had the effect, among other things, of falsely portraying stable earnings growth and reduced income statement volatility and – for year-ended 1998 – of maximizing bonuses and achieving forecasted earnings.   Between 1998 and 2004, Fannie Mae, a shareholder-owned government-

sponsored enterprise, misstated its results of operations and issued materially false and misleading financial statements in various reports and in filings with the Commission.

2.     The Company's misconduct took varied forms. In some instances the Company acted negligently, and in other instances intentionally or recklessly. At the end of 1998, senior management manipulated the Company's earnings in order to obtain bonuses they would otherwise not have received, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

3.     In other periods, the Company's accounting was inconsistent with GAAP, in violation of Sections 17(a) (2) and (3) of the Securities Act of 1933 ("Securities Act")[1], and/or the reporting, books and records, and internal controls provisions of the federal securities laws—Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder. Additionally, the Company's reported financial results were smoothed through misapplications of GAAP. These practices were not disclosed to investors.

4.     As a direct result of these violations, and other errors, Fannie Mae expects to restate its historical financial statements for the years ended December 31, 2003 and 2002, and for the quarters ended June 30, 2004 and March 31, 2004. The Company currently estimates that its restatement will result in at least an $11 billion reduction of previously reported net income.

---

[1] Establishing violations of Section 17(a)(2) and 17(a)(3) does not require a showing of scienter. Aaron v. SEC, 446 U.S. 680, 697 (1980).

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange

Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6.      Venue is proper in the Court pursuant to Section 22(a) of the Securities

Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7.      In connection with the transactions, acts, practices and courses of business

alleged herein, Fannie Mae, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, the mails, and the facilities of a national

securities exchange.

8.      Fannie Mae is headquartered in the District of Columbia, and the

transactions, acts, practices and courses of business alleged herein occurred within the

District of Columbia.

## DEFENDANT

9.      Fannie Mae is a shareholder-owned government-sponsored enterprise

chartered by Congress to expand the flow of mortgage funds by creating a secondary

market. Fannie Mae provides stability in the secondary market for residential mortgages

by increasing the liquidity of mortgage investments and improving the distribution of

investment capital available for residential mortgage financing.  It performs this function

by buying and guaranteeing residential mortgage loans and mortgage-related securities,

which it finances by issuing mortgage-related securities, debt securities, and equity

securities.

10.    At all relevant times, Fannie Mae's common stock traded publicly on the New York Stock Exchange. In March 2003, Fannie Mae voluntarily registered its common stock with the Commission under Section 12(g) of the Exchange Act, thus becoming an Exchange Act reporting company. Prior to its voluntary registration, the Company issued annual and quarterly reports of its financial condition and results of operations that were virtually identical in presentation to the reports filed with the Commission by registrants. In these reports, the Company represented that its financial statements were presented in accordance with GAAP.

## FACTS

### Overview Of The Violations

11.    From at least 1998 through the second quarter of 2004, Fannie Mae issued financial reports that were materially false and misleading, primarily due to its failure to comply with Statement of Financial Accounting Standard ("SFAS") 133. These violations had the result of achieving management's desire: (a) to show predictable and steady earnings growth; and (b) avoid income statement volatility.

12.    In addition to violating SFAS 133, the Company violated other accounting standards, including SFAS 91. The violations of these standards resulted from insufficient accounting systems and related personnel, a lack of internal controls, and – in at least one instance – a desire to maximize bonuses and meet or exceed the published expectations of industry analysts forecasting the Company's reported earnings-per-share and other results.

13.    Fannie Mae's senior management fostered a corporate culture that placed significant emphasis on stable earnings growth and avoidance of income statement

4

volatility, and insufficient emphasis on ensuring compliance with applicable accounting regulations and federal securities laws.

14.·    As a consequence, Fannie Mae implemented a series of non-GAAP policies, procedures, and practices that falsely portrayed the Company's earnings. These non-GAAP policies, procedures, and practices included, but were not limited to: (1) improper accounting for loan fees, premiums, and discounts; and (2) improper hedge accounting.

15.    Several of the transactions, acts, practices, or courses of business alleged herein were directed and/or implemented with the knowledge or approval of Fannie Mae's senior management acting within their scope of authority. In many instances, the Company's non-GAAP policies, procedures, and practices were reviewed by its independent auditor.

**Improper Accounting For Loan Fees, Premiums, And Discounts**

16.    SFAS 91[2] requires companies to recognize loan fees, premiums, and discounts as an adjustment over the life of the applicable loans, to generate a "constant effective yield" on the loans. Because of the possibility of loan prepayments, the "life" of a loan or a group of loans is, necessarily, the product of estimation. The likelihood of prepayment fluctuates with market and other conditions. Consequently, estimated prepayments also change. SFAS 91 requires that changes to the amortization of fees, premiums, and discounts caused by changes in estimated prepayments be recognized as gain or loss in the current period's income statement, in their entirety. Any difference between the prior amortization balance and the current balance due to estimated

---

[2] ACCOUNTING FOR NONREFUNDABLE FEES AND COSTS ASSOCIATED WITH ORIGINATION OR ACQUIRING LOANS AND INITIAL DIRECT COSTS OF LEASES, Statement of Fin. Accounting Standards No. 91, (Fin. Accounting Standards Bd. 1982).

prepayment speeds must be recognized in income for the current period. Fannie Mae referred to this amount as the "catch-up" adjustment.

17.     SFAS 91 applies to various types of assets on Fannie Mae's books, including loans, mortgage backed securities, and real estate mortgage investment conduits. While the company adopted SFAS 91 in 1987, it did not record any catch-up adjustments prior to 1998.

**Fannie Mae Failed To Record The Full SFAS 91 Catch-up Amount For 1998**

18.     In the fourth quarter of 1998, Fannie Mae's accounting models and systems calculated that an approximate $439 million catch-up adjustment, in the form of a decrease to net interest income, was required at year-end. Rather than book this amount consistent with SFAS 91, senior management of the Company directed employees to record only $240 million of the catch-up amount in that year's income statement. By not recording the full amount of the calculated catch-up adjustment, Fannie Mae understated its expenses and overstated its income by a pre-tax amount of $199 million. The unrecorded catch-up amount represents 4.3% of 1998 earnings before taxes ("EBT") and 4.9% of 1998 net interest income ("NII") for the Company's fiscal year 1998.[3]

19.     The Company's management made two additional adjustments in the fourth quarter of 1998 that had the effect of offseting nearly half of the $240 million catch-up adjustment.

20.     The first of these offsetting adjustments was caused by Fannie Mae's change from a non-GAAP to a GAAP treatment on its accounting for tax credits from, and depreciation expense related to, low-income housing tax credits. The change in

---

[3] Net interest income is the interest income earned on assets less interest expense paid on liabilities and capital. This is the gross margin for financial institutions.

treatment resulted in Fannie Mae recognizing two years' worth of credits at year end 1998, which had the net after-tax effect of recognizing $108 million in additional income. As late as November 1998, Fannie Mae planned to change its method of accounting for the tax credit in 1999. However, the change was accelerated to 1998, which substantially offset the recorded SFAS 91 catch-up adjustment.

21.     The second adjustment was made after year-end and just prior to Fannie Mae closing its books for 1998. The Company recognized in income the reversal of aged credit items totaling $3.9 million, describing them as "miscellaneous income." These items came from a suspense account that had a credit balance of over $26 million before the $3.9 million reversal. For the most part, the credit balance in this account related to net interest income. This amount existed in a suspense account from at least as early as 1994, yet there was no reversal of the credit balances in this suspense account until the $3.9 million reversal for 1998.

22.     Management's decisions to book an amount significantly less than the total calculated catch-up amount and to institute the two accounting adjustments in the fourth quarter of 1998 resulted in the Company not only exceeding Wall Street expectations, but also hitting the earnings per share ("EPS") target necessary to trigger maximum bonuses.

23.     Under the Company's Annual Incentive Pool ("AIP") for 1998, an EPS figure of $3.13 would trigger minimum bonuses, an EPS figure of $3.18 would trigger the target bonus, and an EPS figure of $3.23 would trigger maximum bonuses.

24.     Without these improper accounting adjustments, Fannie Mae's management could have received substantially smaller bonuses (based on either a pool of

only $17.3 million or only $8.6 million) or no bonuses at all. For example, prior to the 11th-hour reversal of suspense items, EPS for the year was $3.2285. While this figure exceeded Wall Street estimates of $3.22, it fell short of the $3.23 EPS figure required to trigger maximum bonus payouts. After the $3.9 million reversal of suspense items, EPS for the year was $3.2309, which triggered a maximum AIP bonus pool for management totaling $27.1 million. If Fannie Mae had recorded the full catch-up amount as initially calculated, its EPS would have been $3.10 for year-end 1998, a figure below the minimum threshold for bonuses under the AIP.

25.     By fraudulently failing to book the full amount of catch-up adjustment in the fourth quarter of 1998, Fannie Mae issued financial statements that were materially false and misleading. On January 14, 1999, Fannie Mae publicly issued its financial statements for the period ending December 31, 1998, which overstated pre-tax earnings by 4.3% and net interest income by 4.9%. Moreover, the Company failed to disclose that these figures had been intentionally manipulated to trigger management bonuses.

**Fannie Mae Failed To Record The Full SFAS 91 Catch-up Amount For 1999**

26.     At the direction of senior management, $158 million of the $199 million in unrecorded interest expense from 1998 was bled into the Company's financial statements during 1999. The Company recorded additional interest expense of between $7 million and $22 million a month throughout 1999. Additionally, the Company's calculated catch-up at year-end 1999 was $84 million of interest income, which was not recorded. As a result, Fannie Mae publicly issued materially false and misleading financial statements on January 13, 2000 for the year ended December 31, 1999.

8

### SFAS 91 Accounting Policy

27.     Prior to 2000, the Company had an unwritten policy of only booking SFAS 91 catch-up when it exceeded a "threshold" of +/- $100 million of net interest income ("NII") for the year. Following Fannie Mae's failure to record the full amount of calculated catch-up at year-end 1998, the Company developed a written SFAS 91 policy (the "Policy"). The concept of a threshold remained in the written Policy, and the threshold was calculated as a percentage of either NII or Guaranty Fees ("G-fees") under the rubric of accounting for estimation error. The Policy, which violated GAAP in several respects, allowed the Company to continue to decrease the likelihood of large SFAS 91 adjustments.

28.     The Policy used a "precision threshold" to determine the amount of catch-up Fannie Mae would record at the end of the year. This precision threshold was an amount equal to +/- 1% of NII or +/- 2% of G-fees for the period. Under this Policy, Fannie Mae was able to reduce the amount of catch-up recorded in any given period, as no adjustment would be recorded if the catch-up calculation fell within the threshold, and the Company would only record catch-up that exceeded the precision threshold.

29.     There is no support for the use of a threshold in SFAS 91 or in the Financial Accounting Standards Board ("FASB") implementation guide for SFAS 91 developed to assist companies in complying with the standard. SFAS 91 specifically requires that an adjustment be made when there is a difference between actual and expected prepayments, or a change in expected prepayments, of the loans resulting in a difference from the previous amortization calculation. Under SFAS 91, the amount of catch-up is to be determined based on the company's best estimate of the calculated

catch-up amount, not the best estimate as tempered by a threshold. The overlay of the precision threshold permitted Fannie Mae management to decrease the likelihood of large SFAS 91 adjustments by failing to record in the income statement catch-up adjustments that were within the threshold.

30.    Not only did Fannie Mae's use of a "threshold" violate GAAP, but so did its use of a full year time horizon rather than a quarterly basis as provided in SFAS 91. This practice of using a full-year time horizon for calculating the catch-up adjustment continued until 2003.

31.    Implementation of the Policy led to misstatements of SFAS 91 amortization in all periods from the fourth quarter 2000 through the second quarter 2004. Consistent with the models used by the Company during the relevant timeframe, some of the largest misstatements and omissions occurred in the following financial statements: third quarter 2001, fiscal year 2001, first quarter 2002, third quarter 2002, and fiscal year 2002.

32.    On at least one occasion, Fannie Mae booked income when it was within its Policy threshold, with the effect of meeting its earnings targets. The Company recorded its entire catch-up position of $19.8 million of income as part of its fourth quarter 2001 financial results, despite being within the calculated precision threshold established by the Company's Policy. Prior to recording this adjustment, which was done in January 2002 shortly before Fannie Mae closed its books for 2001, EPS for the fourth quarter was $1.3827 and analysts were expecting EPS of $1.39. After the catch-up adjustment, which was not justified by the Policy, Fannie Mae's quarterly EPS was $1.40.

33.    In the third quarter of 2002, Fannie Mae's calculated catch-up was $80 million over its Policy threshold. To comply with its stated Policy, management should have ensured that a catch-up adjustment of $80 million was recorded to income. Instead, management changed the methodology used to calculate the catch-up amount. This change in methodology improperly reduced the calculated catch-up adjustment by $37 million.

**Improper Hedge Accounting**

34.    In June 1998, the FASB released SFAS 133[4], requiring that, after January 1, 2001, derivatives be accounted for at fair market value. The standard essentially provides that derivatives must be revalued every reporting period, and changes to value must be reported in the income statement. To achieve hedge accounting in compliance with SFAS 133, a company associates each derivative contract with the specific liability, asset or forecasted transaction being hedged.

35.    Prior to the implementation of SFAS 133, derivatives were generally carried at book value on a holder's balance sheet. By requiring that they be carried at ever-changing market values, unless used in a qualifying hedge relationship, the new standard created the potential for increased earnings volatility. This posed a significant challenge to Fannie Mae's goal of avoiding volatility in its financial statements.

36.    An initial draft of SFAS 133 was released by the FASB in June 1996, at which point Fannie Mae began the process of evaluating and implementing the standard. As Fannie Mae uses debt to finance the acquisition of mortgages and mortgage securities, it uses derivative instruments to hedge against the effect of fluctuations in interest rates

---

[4] ACCOUNTING FOR DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES, Statement of Fin. Accounting Standards No. 133 (Fin. Accounting Standards Bd. 1998).

on its debt costs. It quickly became apparent to the Company's management that SFAS 133 could cause an undesirable amount of earnings volatility. Minimizing, or to the extent possible eliminating, this earnings volatility became a focus of members of senior management.

37.    Because financial instruments react differently to interest rate movements, it is often difficult to perfectly hedge a debt issuance with an offsetting derivative. To the extent instruments do not perfectly offset each other, SFAS 133 generally requires companies to measure and record this "ineffectiveness" in their income statements.[5] This process is commonly referred to as the "long-haul" method. Thus, consistent with the standard, earnings volatility associated with the use of derivatives is minimized to the extent hedge relationships are "effective." Significantly, SFAS 133 allows for special exceptions, known colloquially as the "short-cut" and "matched terms" methods (or the "perfect effectiveness" method) of hedge accounting. These narrow exceptions allow qualifying companies to avoid the burdensome requirement of measuring and recording hedge ineffectiveness, and to avoid income statement volatility that can otherwise result from SFAS 133.

38.    Given the size of its portfolio, Fannie Mae did not have the systems or personnel necessary to perform long-haul accounting. Moreover, the long-haul method would result in the income statement volatility that senior management wanted to avoid.

39.    The Company disregarded the requirements of SFAS 133 and qualified transactions for the "short-cut" method based on erroneous interpretations and an unjustified reliance on materiality. By failing to comply with the requirements of SFAS

---

[5] Ineffectiveness is essentially the differential between the change in value of the derivative and the change in value of the hedged item.

133, the Company failed to qualify for hedge accounting. This failure led to the

Company publicly issuing materially false and misleading financial statements for the

periods covering the first quarter 2001 to the second quarter 2004. The vast majority of

the anticipated restatement of at least an $11 billion reduction of previously reported net

income is a result of Fannie Mae's improper hedge accounting.

### Other GAAP Violations—Reporting, Books And Records, & Internal Controls

### Accounting For Loan Loss Reserves

40.     GAAP requires an assessment of the loss exposure inherent in a loan

portfolio and adjustments reflecting management's estimate of losses in the portfolio be

made on a quarterly basis. Between 1997 and 2003, Fannie Mae performed no

quantitative assessment, and instead relied on management's qualitative judgment in

determining the appropriate loan loss reserve ("LLR"). The failure to establish and

implement an appropriate model for determining the size of the LLR was a violation of

GAAP.[6]

41.     The Company maintained an unjustifiably high level of LLR in case it was

needed to compensate for possible future changes in the economic environment. This

approach is not consistent with GAAP which requires that the estimate of loss reserves be

based on losses currently inherent in the loan portfolio. At year-end 2002, Fannie Mae's

LLR was overstated by at least $100 million. This overstatement resulted in a $100

million understatement of earnings before tax, which represented 1.6% of 2002 EBT, and

8 cents of additional EPS on the year-end 2002 EPS figure of $4.52.

---

[6] ACCOUNTING FOR CONTINGENCIES, Statement of Fin. Accounting Standards No. 5 (Fin. Accounting Standards Board 1975).

**System Realignment Adjustments**

42.     Fannie Mae utilized several systems to calculate, record, and track premium and discount data on its loans and securities.  At certain times, the premium and discount amortization system (known as "iPDI") would be manually adjusted to match the loan and securities databases (known as the "STATS" and "LASER" systems), resulting in a "realignment."  These realignments produced a difference in accumulated amortization, which should have been adjusted for in the current period or may have required restatement of prior periods under GAAP.  Rather than consistently follow the appropriate accounting guidance, Fannie Mae used three different methods to account for the realignment adjustments, two of which were improper under GAAP, and resulted in reported results that improperly spread the impact of these adjustments over time.

43.     APB 20[7] governs the treatment of accounting errors, and states that a company should determine the impact of the error on prior periods, as well as the impact of correcting those prior periods on the current period.  Any material impacts must be reported as a prior period adjustment, and then disclosed in the current period's financial statements.  Rather than apply this accounting guidance, Fannie Mae immediately recorded smaller realignments in the income statement but deferred large adjustments and recognized those as income statement items over future periods.  The inconsistent accounting treatments utilized by the Company allowed it to avoid volatility in its financial statements from the required system realignment adjustments.

---

[7] ACCOUNTING CHANGES, Accounting Principles Bd. (APB) Opinion No. 20 (Accounting Principles Bd. 1971).

14

**Finite Insurance Transaction**

44.    In May 2001, Fannie Mae's Office of the Chairman suggested that the

Company undertake an initiative to shift current income to future periods.  One such

initiative involved employees in the Company's credit policy group entering into a finite

insurance contract in January 2002.  The Company recognized the approximate $40

million premium under the contract as an expense, and recorded as income the loss

recoveries from the insurer in subsequent periods.  GAAP requires that an insurance

contract result in a transfer of risk to the insurer in order for the premium paid to be

recorded as an expense, otherwise the premium is to be recorded as a deposit on the

balance sheet.  This contract did not have sufficient risk transfer to qualify.  Improperly

treating the approximate $40 million premium as an expense lowered the Company's

earnings by $13.5 million in each of 2002 and 2003, and approximately $8 million in

2004.

**Classification Of Securities Held In Portfolio**

45.    SFAS 115[8] requires an entity to classify securities it acquires as either

held-to-maturity ("HTM"), available-for-sale ("AFS"), or trading at the time of

acquisition.  Once a security is classified as HTM, it can be reclassified only in narrow

circumstances.  Rather than adhere to the clear guidance under GAAP, Fannie Mae

initially classified the securities it acquired as HTM, and then at the end of the month of

acquisition, decided on the ultimate accounting classification.  GAAP requires that the

accounting classification be made at the time of acquisition.  This GAAP violation also

illustrates a significant internal control deficiency, as the Company could have

---

[8]  ACCOUNTING FOR CERTAIN INVESTMENTS IN DEBT AND EQUITY SECURITIES, Statement
of Fin. Accounting Standards No. 115 (Fin. Accounting Standards Bd. 1993).

improperly determined classification based on the change of a security's value between the date of acquisition and the end of the month.

### Recognition Of Interest Income And Expense

46.    Rather than recognize interest expense in accordance with the required terms of the instrument, Fannie Mae programmed its accounting systems to calculate interest expense and income on its investments and debt instruments as if there were 30.4 days in each month. Fannie Mae's systems used this assumption even if the terms of the instrument specified interest payments on a different basis. By using a standard figure, the Company avoided fluctuations in interest income and expense that would have occurred due to the fact that not every month has the same number of days, nor do the four quarters of the year. The Company discontinued this practice in early 2003.

### Amortization Of Debt Issuance Costs

47.    Fannie Mae amortizes debt issuance cost over the estimated life of the related debt. In the case of callable debt securities, the Company periodically adjusted the estimated life based on its current estimated call date. There appears to have been no consistent policy established regarding when the Company would make such a revision and evidence suggests that certain adjustments were made based on their impact on reported earnings. For example, the Company revised the estimated life of its callable debt in the third quarter of 2002, which had the effect of substantially offsetting a $43 million income item in that same period. GAAP requires that financial statements be prepared on a consistent basis and Fannie Mae's discretionary approach regarding the amortization of its debt issuance costs does not comply with this requirement.

### Accounting For Forward Commitments

48.     SFAS 149[9], which became effective on July 1, 2003, amended SFAS 133 by requiring entities to treat certain firm commitments to purchase or sell mortgage loans or mortgage backed securities ("MBS") as derivatives. Under SFAS 149, changes in the value of these commitments would be recorded in the financial statements unless they qualified for hedge accounting. Fannie Mae violated GAAP by failing to timely or adequately determine whether its mortgage commitments qualified for hedge accounting in accordance with SFAS 149. Because of inadequate resources in the departments most affected by SFAS 149, the Company did not adopt a final accounting policy until several months after SFAS 149 became effective. In addition, the hedge relationships were not properly documented at the inception of the hedge, therefore invalidating the use of hedge accounting. Even as late as the middle of 2004, the Company was still adjusting the specifications in its hedge accounting systems that dealt with SFAS 149 instruments.

### Consolidation Of Certain Securitization Transactions

49.     In connection with its adoption in 2003 of FASB Interpretation No. 46 (FIN 46R)[10], Fannie Mae failed to consolidate certain trusts used in connection with securitization transactions that were required to be consolidated on the balance sheet of the Company. The Company's failure resulted in an understatement in the assets and liabilities recorded on its balance sheet for any portion of the trusts owned by third parties. The consolidation will also result in the reclassification of security positions from securities to the actual assets held by the trust (principally loans or Fannie Mae MBS). In

---

[9] AMENDMENT OF STATEMENT 133 ON DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES, Statement of Fin. Accounting Standards No. 149 (Fin. Accounting Standards Bd. 2003).
[10] CONSOLIDATION OF VARIABLE INTEREST ENTITIES – AN INTERPRETATION OF ARB NO. 51, Fin. Accounting Standards Bd. Interpretation No. 46(R) (Fin. Accounting Standards Bd. 2003).

addition, the assets will be recorded at fair value on the date of consolidation, which may

result in a gain or loss. Based on the Company's initial evaluation approximately $28.5

billion of both incremental assets and liabilities will be recognized in the financial

statements.

### Accounting For Dollar Rolls

50.    Fannie Mae entered into short-term financing arrangements with

counterparties that involved the Company "selling" a security out of its portfolio as

collateral and agreeing to repurchase the same or "substantially the same" security at a

later date. SFAS 140[11] permits these types of transactions to be accounted for as

financings provided that certain conditions are met. If the requirements are not met, then

security sale and purchase accounting is required. Fannie Mae failed to appropriately

apply SFAS 140 in several respects. The Company's various departments failed to

coordinate with each other to appropriately monitor the Dollar Roll transactions. This

lack of oversight led the Company to fail to contemporaneously apply the tests necessary

to determine whether the securities returned on the Dollar Roll transactions met the

requirements to be considered "substantially the same" security. Additionally, SFAS 140

requires that entities monitor whether or not the cash received is adequate to repurchase

the security sold. If the cash received is insufficient, the entity must request additional

assets or cash from the counterparty. Fannie Mae had no procedures in place to meet this

requirement.

---

[11] ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND
EXTINGUISHMENTS OF LIABILITIES – A REPLACEMENT OF FASB STATEMENT NO. 125,
Statement of Fin. Accounting Standards No. 140 (Fin. Accounting Standards Bd. 2000).

## Valuation Of Aircraft Asset Backed Securities

51.     In the second quarter of 2003, having determined that its investments in aircraft asset backed securities ("ABS") had suffered an other than temporary impairment ("OTTI"), Fannie Mae reduced the value of its investment and recorded an expense of $83.5 million.  The amount of the write-down was based on values obtained from an internal discounted cash flow model instead of available market prices.  GAAP, and specifically SFAS 115, indicates that quoted market prices should be used to determine the amount of asset impairment.  Market prices at the time indicated that the value of these securities was $45 million lower than the amount to which Fannie Mae wrote down its aircraft ABS.  Under GAAP, the Company's adjustment should have been made according to this market price, and thus was understated by $45 million in expense.  Failure to record the entire expense amount resulted in the Company overstating its income by $45 million in 2003.  The $45 million in unrecorded expense represented 3.2% of quarterly earnings before tax in the second quarter of 2003, and 3 cents on 2003 EPS of $7.91.

## FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

52.     Paragraphs 1 through 26 are realleged and incorporated by reference as if set forth fully herein.

53.     As a consequence of the foregoing, Defendant Fannie Mae directly or indirectly, by use of the means and instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue

statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

54.     In connection with the above described acts or omissions, Defendant Fannie Mae acted knowingly or recklessly.

55.     By reason of the foregoing, Defendant Fannie Mae violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

## SECOND CLAIM

### Violations of Section 17(a)(2) and (3) of the Securities Act

56.     Paragraphs 1 through 10 and 27 through 39 are realleged and incorporated by reference as if set forth fully herein.

57.     As a consequence of the foregoing, Defendant Fannie Mae, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (a) obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

58.     By reason of the foregoing, Defendant Fannie Mae violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

### THIRD CLAIM

**Violation of Section 13(a) of the Exchange Act and**
**Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder**

59.     Paragraphs 1 through 51 are realleged and incorporated by reference as if set forth fully herein.

60.     Section 13(a) of the Exchange Act and the rules promulgated thereunder require every issuer of registered securities to file reports with the Commission that accurately reflect the issuer's financial performance and provide other true and accurate information to the public.

61.     As a consequence of the foregoing, Defendant Fannie Mae filed materially false and misleading financial statements with the Commission.

62.     By reason of the foregoing, Defendant Fannie Mae violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] promulgated thereunder.

### FOURTH CLAIM

**Violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**

63.     Paragraphs 1 through 51 are realleged and incorporated by reference as if set forth fully herein.

64.     As a consequence of the foregoing, Defendant Fannie Mae failed to make and keep books, records, and accounts which accurately and fairly reflected the transactions and disposition of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act , and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Fannie Mae's corporate transactions were

executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with GAAP in violation of Section 13(b)(2)(B) of the Exchange Act.

65.    By reason of the foregoing, Fannie Mae violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(a)    Grant a permanent injunction restraining and enjoining Defendant Fannie Mae and its officers, agents, servants, employees, attorneys, assigns and all those persons in active concert or participation with it who receive actual notice of the Final Judgment by personal service or otherwise, from, directly or indirectly, violating Sections 17(a)(2) and (3) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder;

(b)    Order Defendant Fannie Mae to disgorge all ill-gotten gains, together with prejudgment interest;

(c)    Order Defendant Fannie Mae to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(d)    Order, pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, that the amount of civil penalties ordered against and paid by the Defendant be added to and become part of a disgorgement fund for the benefit of the victims of the violations alleged herein; and

(e)     Grant such other and further relief as this Court deems necessary and

appropriate under the circumstances.

Dated:  May 23, 2006

                              Respectfully submitted,


                              _____
                              Jordan A. Thomas (Bar No. 452886)
                              Peter H. Bresnan
                              Paul R. Berger
                              Richard W. Grime
                              Charles E. Cain
                              Margaret S. McGuire
                              Rachael E. Schwartz
                              Bryan J. Sillaman

                              SECURITIES AND EXCHANGE COMMISSION
                              Division of Enforcement
                              100 F Street, N.E., Mail Stop #4030
                              Washington, DC 20549
                              Tel.: (202) 551-4475 (Thomas)
                              Fax.: (202) 772-9245 (Thomas)
                              Attorneys for Plaintiff