## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 1:06-cv-00959 (RJL) |
| v. | : | |
| | : | |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |

## DECLARATION OF GERALD B. LUMER

I, Gerald B. Lumer declare and state as follows:

### Introduction and Qualifications

1.     I joined the United States Securities and Exchange Commission as an Economic Fellow in November 2003 and was promoted to Financial Economist in September of 2005.  Over the years, I have regularly been asked to analyze issues relating to determining the amount of harm caused by specific instances of securities fraud and equitably allocating settlement proceeds following the resolution of such claims.  I currently provide oversight and quality control for the economic analysis involved in distributing over $2.5 billion obtained by the SEC in its actions against those involved in market timing and late trading.  On behalf of the Commission, I recently submitted a declaration in support of a $153 million proposed distribution plan to the United States District court in SEC v. Daniel Calugar and Sec. Brokerage, Inc., Case No. CV-S-03-1600-RCJ-RJJ (D. Nev.).  In this case, I submit this declaration in support of the Unopposed Motion by Plaintiff Securities and Exchange Commission for Creation of a Fair Fund, Approval of a Distribution Plan, and Appointment of a Distribution Agent.

2.     I earned my Ph.D in economics at MIT in 1995.  My fields of concentration were

finance and econometrics.  Subsequently, I worked for four years in the Antitrust

Division of the U.S. Department of Justice.  While at the Department of Justice I advised

senior staff on allegations of price fixing by market makers on the NASDAQ stock

market.  I published Compensation, Turnover, and Top Management Incentives:

Historical Evidence with Charles J. Hadlock in the Journal of Business, which was

awarded the Merton Miller award for the best paper in the Journal of Business in 1997.  I

served as a discussant at meetings of the Western Finance Association and the Financial

Management Association.  I am also an adjunct Professor at the University of Maryland

where I teach an MBA level course on equity valuation and portfolio management.  A

summary of my background and qualifications is attached as Exhibit A to this

declaration.

Overview of Assignment

3.     In this case, I was asked to design an equitable plan to allocate the approximately

$350 million currently being held in the Court's registry ("Distribution Plan") among

investors who acquired Federal National Mortgage Association ("Fannie Mae") securities

from January 14, 1999 through December 22, 2004.  The Distribution Plan was designed

based upon my analysis of the economic evidence in this case and my review of a

substantial amount of relevant information, including:  (i) the Complaint; (ii) news

reports relating to the violations alleged in the complaint (iii) press releases; and (iv)

trading information relating to Fannie Mae's securities, as well as information regarding

market indices.  Below is a more detailed explanation of why, in my opinion, the

Distribution Plan is fair and reasonable to potentially injured investors of Fannie Mae, from an economic point of view.

Background

4.    Fannie Mae is a shareholder-owned government-sponsored enterprise chartered by Congress to expand the flow of mortgage funds by creating a secondary market. Fannie Mae provides stability in the secondary market for residential mortgages by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing. It performs this function by buying and guaranteeing residential mortgage loans, which it finances by issuing mortgage-related securities, debt securities, and equity securities. At all relevant times, Fannie Mae's common stock traded publicly on the New York Stock Exchange.

5.    According to the Commission's complaint, Fannie Mae engaged in a pervasive financial fraud which deceived investors about its true financial condition and actual performance. As charged in the complaint, the period of misconduct extends from on or about January 14, 1999, when Fannie Mae announced its 1998 year-end earnings through on or about December 22, 2004, when the company announced that it would restate its financial statements for the years 2001 through mid-2004 ("Recovery Period").

6.    A public company's historical financial results are used by analysts and investors to forecast future results. The future earnings (or cash flows) forecast of a company is then used by analysts and investors to value the company's securities. Consequently, if a company's historical financial results are overstated, this will likely inflate the company's stock price. In my opinion, the allegedly false financial results reported by Fannie Mae during the Recovery Period were material or, in other words, something a reasonable

investor would have wanted to consider prior to making an investment decision in the Company's securities.

## Distribution Plan

7.    The fraud alleged in this case relates primarily to Fannie Mae's false and misleading financial results reported by the company during the Recovery Period. These false and misleading financial statements increased investors' expectations of the company's future prospects and inflated the prices of its securities. The corrective disclosures deflated these security prices by furnishing investors with accurate information about the company's financial condition and its alleged violations. Investors who bought securities at inflated prices after January 14, 1999 and held these securities through the corrective disclosures suffered losses. The objective of the Distribution Plan is to equitably distribute the settlement proceeds to those investors in proportion to their losses.

8.    I determined the amount of inflation caused by the alleged violations using an event study. An event study attempts to estimate the effect of an event (here the alleged violations) by examining how the market reacted to its disclosure. The market reaction is measured by the return of the security on the date of the disclosure after controlling for any change in the security's price due to news that would affect the market as a whole. The market reaction to a specific event is often called the "abnormal return."

9.    In order to accurately estimate the effect of an event such as the disclosure of an alleged fraud, one must have daily data on how the market valued the security (i.e. the price at which the security traded). This data was available for Fannie Mae's common

stock and certain classes of its preferred stock. However, this type of data was not available for Fannie Mae's debt offerings or securities guaranteed by Fannie Mae.

10.     There were a number of corrective disclosures relating to the alleged fraud. Using an event study, I estimated the market's reaction to all of these corrective disclosures taken together. I found that the reaction was statistically significant (unlikely to be due to chance) for Fannie Mae's common stock and its Class N preferred stock. For the other classes of preferred stock either daily data was not available or the reaction to the alleged fraud was so small that I could not reasonably exclude the possibility that it was caused by chance.

11.     I then estimated the amount of inflation for the common stock and the Class N preferred shares in the following manner. Again using an event study, I estimated the market's reaction to each corrective disclosure (i.e. the abnormal return on the date of each disclosure). For each security there were a number of corrective disclosures where the reaction was not statistically significant. Statistical significance is a criteria commonly used in economic research. A reaction is not statistically significant if it is so small one can not exclude the possibility that it was caused by chance. To avoid contaminating my estimate of inflation with price changes unrelated to the alleged violations, I did not consider days when the reaction was so small it could have been due to chance (i.e. on days when the reaction was not statistically significant).

12.     My analysis revealed that there was a statistically significant reaction on the common stock to corrective disclosures on nine days [September 22, 2004; September 23, 2004; March 17, 2005; April 4, 2005; April 6, 2005; August 10, 2005; September 28,

---

[3] See Fannie Mae 10-Q for the period ended 9/30/2003, p. 35; available at:
http://www.sec.gov/Archives/edgar/data/310522/000095013303003943/w90482e10vq.htm.

2005; September 29, 2005; May 9, 2006]. There was a statistically significant reaction on the Class N Preferred on three days [September 23, 2004; December 16, 2004; and March 15, 2005]. For each of the dates identified, I have assumed that the abnormal return on that day was attributable to the disclosure of information related to the alleged violations and not any confounding events that may have impacted the price the same day. I assumed each security's price was no longer inflated the day after the last statistically significant corrective disclosure for that security. For the day of the last statistically significant corrective disclosure, I assumed the fraud induced inflation was equal to the abnormal return of the stock on that day. For each day prior to the last statistically significant corrective disclosure, I assumed any fraud induced inflation was equal to the cumulative abnormal return of the stock on the days of all subsequent statistically significant disclosures.

13.     I will illustrate my approach with the Class N preferred. There were three statistically significant corrective disclosure days for the Class N preferred. The last was on March 15, 2005. On this day the Class N preferred fell 2% controlling for the market suggesting the stock was overvalued by 2% on and prior to March 15, 2005. The penultimate statistically significant corrective disclosure day was December 16, 2004. On this day the Class N preferred fell 3% controlling for the market. Adding the 3% drop on December 16, 2004 to the 2% drop on March 15, 2005 suggests the Class N preferred was inflated by 5% on and prior to December 16, 2004. The first statistically significant disclosure day was September 23, 2004. On this day the Class N preferred fell 2% controlling for the market. This suggests the Class N preferred was inflated by 7% between September 23, 2004 and September 25, 2003, the day it began trading.[3] The

chart below shows the percent inflation of the Class N preferred on each day during the Recovery Period.



14.    I estimated the artificial inflation in Fannie Mae Class N preferred by multiplying the percentage inflation by the stock price on each day.  For example, if the stock price was $50 and the inflation was 10% on a particular day, I would estimate the artificial inflation was $5.    There were days when no transaction prices were available for the Class N preferred stock.  On all such days after October 6, 2003, I assumed the artificial inflation was equal the artificial inflation on the prior day.  Transaction prices were also unavailable between September 25, 2003 (when the shares were sold by Fannie Mae) and October 3, 2003.  For these dates I could not use the prior day's inflation so I assumed the artificial inflation was equal to the artificial inflation on October 6, 2003.  I used the same approach discussed in paragraphs 13 and 14 for Fannie Mae's common stock.

15.    For shares of Fannie Mae common stock that were sold prior to September 22, 2004, the claim per share is $0.  For shares of Class N preferred stock that were sold prior to September 23, 2004 the claim per share is $0.  No recovery was provided for these

plaintiffs as they sold their shares prior to the first corrective disclosure. Consequently, I determined that this group purchased and sold their Fannie Mae shares under the same set of allegedly false information and that their losses, therefore, were not caused by the alleged fraud.

16.    For each share of Fannie Mae common stock or Class N preferred that was purchased between January 14, 1999 and December 22, 2004, and that was still held as of the close of trading on May 23, 2006, the Recognized Loss per share is the artificial inflation on the date of purchase indicated in Appendices I and II of the Distribution Plan.

17.    For each share of common or Class N preferred that was purchased between January 14, 1999 and December 22, 2004, and sold prior to May 24, 2006, the Recognized Loss per share is the artificial inflation on the date of purchase minus the artificial inflation on the date of sale.   The Distribution Agent shall determine which shares were sold in the following manner.  For common stock, the Distributon Agent shall begin with the earliest chronological sale of Fannie Mae common stock and match each sale first against the eligible claimant's position, if any, of Fannie Mae common stock as of the close of trading on January 13, 1999 (the day prior to the beginning of the Recovery Period) and next against the earliest purchase of Fannie Mae common stock during the Recovery Period.  For claimants who conducted multiple transactions in Fannie Mae common stock during the Recovery Period, the earliest subsequent sale will be matched first against those shares in the claimant's opening position on the first day of the Recovery Period, and then matched chronologically thereafter against each purchase made during the Recovery Period.   For the Class N preferred shares, the Distributon Agent shall use the same procedure.

18.    "Eligible Loss Amount" in Fannie Mae common stock during the Recovery

Period, is the sum total of the claimant's recognized losses per share multiplied by the

number of shares associated with each transaction described above.

19.    The Distribution Plan sets aside an amount of the Fair Fund sufficient to cover the

costs of taxes, the tax administrator and the Distributon Agent.  If the remaining money

in the Fair Fund is sufficient, each authorized claimant will receive an amount equal to

the eligible claimant's Eligible Loss Amount described above. If there are not sufficient

funds, the remaining money in the Fair Fund will then be divided among claimants on a

pro rata basis.

20.    Any appeal will be limited to the claimant's status as a potentially eligible claimant

and the validity and amount of the claim.

21.    The Distribution Plan excludes all other classes of preferred shareholders because

there was no statistically significant price reaction to the corrective disclosures, or so

little trading in these securities was reported that it was impossible to reasonably estimate

the effect of the alleged fraud.  All holders of debt and securities guaranteed by Fannie

Mae were excluded because these securities were numerous and the vast majority of the

trading in them was not reported, making it impossible to reasonably estimate the effect

of the fraud on specific securities.  Accordingly, I determined that a distribution to these

investors is both impracticable and inappropriate.

22.    The approach and assumptions I used to develop the Distribution Plan are

consistent with those generally accepted and used by economists in allocating settlement

proceeds.

## Conclusion

23.    In my opinion, the Distribution Plan, as described above, allocates the settlement proceeds to those plaintiffs who suffered the most economic losses as a result of Fannie Mae's alleged misconduct and for whom it is possible to quantify their losses.  Therefore, in my opinion and based on the reasons set forth above, the Distribution Plan is both fair and reasonable to investors injured by Fannie Mae's alleged misconduct.

24.    I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.


Dated: March 28, 2007


_____
Gerald B. Lumer

Gerald B. Lumer
U.S. Securities and Exchange Commission
100 F Street NE, Washington DC, 20549-9040
202 551 6611, lumerg@sec.gov

Current Position:

U.S. Securities and Exchange Commission, Financial Economist

Education:

PhD (Economics), Massachusetts Institute of Technology 1995

Internal Medicine Internship: Mayo Clinic, Rochester MN, 6/02 – 9/03
MD, McGill Faculty of Medicine, Montreal Canada, 2002
BA, Duke University, 1987

Honors:

Merton Miller Award for the best paper published in the Journal of Business in 1997

National Science Foundation Fellowship 1988-1991

Testimony:

In the matter of Paul Flynn: Administrative Proceeding File No.: 3-11390, Expert Report, January 2006

Testimony before the Securities and Exchange Commission, March 2006, Explained how market timing and late trading is harmful in general and estimated harm specifically due to trading allegedly aided by Mr. Flynn

Declarations:

Two declarations to the U.S. District Court (Las Vegas) estimating harm due to late trading by defendant Daniel Calugar (October 2004) and allocating the $153 million settlement between victims (September 2006) SEC v. Daniel Calugar and Security Brokerage, Inc., Case No. CV-S-03-1600-RCJ-RJJ (D. Nev.))

Work Experience:

Economic Fellow, 2003 to 2005, and Financial Economist 2005-Present, U.S. Securities and Exchange Commission.

Adjunct Professor, Robert H. Smith School of Business, University of Maryland, 2006 to present, teach valuation and portfolio management to advanced MBAs.

**EXHIBIT A**

Economist, Antitrust Division, U.S. Department of Justice, 1994 – 1998

Publications:

Cost Evaluation of Rhythm Control Methods for Atrial Fibrillation: Evidence from CTAF, Cardiac Electrophysiology Review (2003), vol. 7, 211-214

Economic Issues in the Residency Match, JAMA (2003) vol. 289:2502.

Amiodarone reduces procedures and costs in a controlled clinical trial, European Heart Journal (2002) vol. 23, 1050-1056

"Compensation, Turnover, and Top Management Incentives: Historical Evidence,", *Journal of Business,* (1997), vol. 70, 153-188.

Regulatory Proceedings:

Evaluation of the U.S. Department of Justice in the matter of SBC's application to provide in region interlata services in the state of Oklahoma, May 1997

Evaluation of the U.S. Department of Justice in the matter of Bell South's application to provide in region interlata services in the state of Louisiana, August 1998

Presentations:

American College of Cardiology 2001
Seminar, Antitrust Division, U.S. Department of Justice
Discussant: Meetings of the Western Finance Association 2005
Discussant: Meetings of the Financial Management Association 2004